IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EBBYNN EUBANKS,

          *Plaintiff,*

    v.

FOOT LOCKER RETAIL, INC. *doing business as* FOOT LOCKER AT ROSS PARK MALL,

          *Defendant.*

Civil Action No. 2:23-cv-1923

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

    Plaintiff Ebbynn Eubanks, a former employee of Defendant Foot Locker Retail, Inc., *d/b/a* Foot Locker at Ross Park Mall ("Foot Locker"), has brought the following claims against Foot Locker: Count I – sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* ("PHRA"); Count II – hostile work environment under Title VII and the PHRA; Count III – discrimination under the Americans with Disabilities Act, 29 U.S.C. § 12101, *et seq.* ("ADA"), and the PHRA; Count IV – retaliation and wrongful termination in violation of the ADA and the PHRA; and Count V[1] – hostile work environment in violation of the ADA and the PHRA. (ECF No. 1). Foot Locker filed a motion for summary judgment seeking judgment

---

[1] Eubanks labeled two separate counts as "Count IV" in his complaint. He has acknowledged "that due to a scrivener's error, the last two counts in [his] Complaint are titled 'Count IV.'" (ECF No. 50, p. 22, n.12). In his briefing, Eubanks refers to the second Count IV, which deals with his hostile work environment claims under the ADA and the PHRA, as Count V. (*Id.*). The Court will do so as well.

in its favor as to all of Eubanks' claims. (ECF No. 41). For the following reasons, the Court will grant the motion.

## I. FACTUAL BACKGROUND

Eubanks was employed by Foot Locker from December 20, 2021, until January 3, 2023, as a full-time sales associate at the store located at Ross Park Mall, 1000 Ross Park Mall Drive, Pittsburgh, Pennsylvania. He began gender transitioning from female to male in 2018. Prior to his employment at Foot Locker, Eubanks underwent partial gender reassignment surgery – he had a double mastectomy in December 2020, and a hysterectomy in May 2021. He also underwent testosterone therapy. Prior to his surgeries, Eubanks was diagnosed with gender dysphoria, but he never disclosed to anyone at Foot Locker that he suffered from it. He also never told anyone at Foot Locker that he was a transgender male. (ECF No. 43, pp. 1-2); (ECF No. 53, p. 1); (ECF No. 58, pp. 1-4); (ECF No. 52, pp. 1, 4); (ECF No. 59, pp. 1-3, 7).

Logan Solomon was Eubanks' store manager from 2021 until the summer of 2022 when Solomon resigned. In a conversation about sports that occurred months before Solomon resigned, according to Eubanks, Solomon said that Eubanks would not understand the conversation because Eubanks was not a real man.[2] Eubanks never raised a complaint about Solomon's comment to anyone at Foot Locker. (ECF No. 43, pp. 3-4); (ECF No. 53, pp. 4-5); (ECF No. 58, pp. 9-11); (ECF No. 52, p. 8); (ECF No. 59, p. 16).

After Solomon resigned, Rebecca King ("King") became Eubanks' store manager. In October 2022, Eubanks sent text messages to King in a group chat that included six other store

---

[2] Eubanks is of the opinion that Solomon discovered he was transgendered and told other co-workers. (ECF No. 52, p. 8); (ECF No. 59, p. 16).

employees. Therein, he stated that his work schedule was weak "asf" (as fuck).[3]  In a follow-up message he wrote, "I know you can read the words didn't [sic] stutter." King brought Eubanks' text messages to the attention of her district manager, Matt Szeszak ("Szeszak"),[4] who then brought them to the attention People Solutions Field Manager Tom Husser.[5]  On October 31, 2022, Husser opened an investigation into Eubanks' conduct.  Thereafter, in December 2022, Eubanks had seven call-offs or no-call/no-shows for work.[6]  (ECF No. 43, pp. 2-3); (ECF No. 53, pp. 1-4); (ECF No. 58, pp. 4-9).

After the call-offs or no-call/no-shows for work, sometime in December 2022,[7] the son of Eubanks' ex-girlfriend came into the store and disclosed Eubanks' transgender status.  (ECF No. 44-2, p. 19).  According to Eubanks, the next day, King called him "it" and a "little faggot." Also that day, a part-time sales associate called him a "dyke," and referred to Eubanks by the name he used prior to his gender transition (Ebony).  Eubanks alleges that on three more shifts the same part-time sales associate called him by his prior name.  (ECF No. 43, pp. 4-5); (ECF

---

[3] Eubanks has admitted that the use of "asf" was unprofessional.  (ECF No. 43, p. 2); (ECF No. 53, p. 2).

[4] Szeszak began working for Foot Locker in 2001.  (ECF No. 52, p. 3); (ECF No. 59, p. 5).

[5] Husser worked for Foot Locker for thirty-two years.  He conducted investigations and made recommendations about terminating employees.  His position was eliminated due to a structural change and he separated from Foot Locker in early March 2024.  (ECF No. 52, p. 3); (ECF No. 59, pp. 4-5).

[6] Eubanks claims that King intentionally scheduled him for shifts that she knew he was unable to work due to his other job.  (ECF No. 52, p. 10); (ECF No. 59, p. 19).  Regardless, Eubanks does not dispute that he did not show up to work his scheduled shifts at Foot Locker.

[7] Eubanks testified during his July 26, 2024, deposition that this incident occurred on December 23, 2022.  (ECF No. 43, p. 4); (ECF No. 44-2, pp. 6, 8).  Now, in response Foot Locker's summary judgment pleadings, Eubanks claims he was mistaken about the exact date.  (ECF No. 53, p. 5).

No. 53, pp. 5-7); (ECF No. 58, pp. 16-18). Eubanks was also told by coworkers that people were making homophobic comments behind his back. (ECF No. 52, p. 9); (ECF No. 59, p. 18). Eubanks complained about the comments to Assistant Store Manager Tai Davis ("Davis").[8] Davis resigned from Foot Locker on December 21, 2022, and never returned to the store after his resignation. Davis never brought Eubanks' complaint to King, Szeszak, or Husser, and he never called Foot Locker's Human Resources Hotline. (ECF No. 43, p. 6); (ECF No. 53, pp. 7-8); (ECF No. 58, pp. 17-18).

Eubanks worked only five shifts between December 24, 2022, and January 2023. (ECF No. 43, p. 5); (ECF No. 53, p. 7). During that time, he never raised any complaints to Szeszak and he never called Foot Locker's Human Resources Hotline to report the comments made by his coworkers. (ECF No. 43, p. 6); (ECF No. 53, p. 7); (ECF No. 58, p. 16).

Due to Eubanks' unprofessional text messages in October 2022, and his call-offs or no-call/no-shows for his scheduled shifts in December 2022, Husser recommended on January 3, 2023, that Foot Locker terminate Eubanks' employment. Szeszak instructed King to do so, and Eubanks' employment was terminated on January 3, 2023. It was only after the termination that Eubanks called Foot Locker's Human Resources Hotline. (ECF No. 43, p. 3); (ECF No. 53, p. 4); (ECF No. 52, p. 14); (ECF No. 59, p. 27). Neither Husser nor Szeszak learned that Eubanks was transgendered (and that Eubanks believed he suffered from a disability) until this lawsuit was filed. (ECF No. 43, p. 7); (ECF No. 53, p. 9); (ECF No. 58, pp. 20-21).

## II.    STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.

---

[8] Davis overheard conversations between staff members talking amongst themselves about Eubanks' sex, sexuality, and transgender status. (ECF No. 59, p. 16).

Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## III. ANALYSIS

### A. Summary judgment will be entered in favor of Foot Locker as to Count I.

In Count I of his complaint, Eubanks brings a claim of sex discrimination under Title VII and the PHRA. Eubanks claims that as a transgender male he was part of a protected class, and that he was wrongfully terminated. (ECF No. 1, pp. 4-6). Title VII establishes that it is unlawful for an employer to discriminate against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). The United States Supreme Court recently held that the statute applies to "[a]n employer who fires an individual merely for being gay or transgender." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 683 (2020). It stated, "[b]y discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today." *Id.* at 669. "Claims under the [PHRA] [generally] are interpreted coextensively with Title VII claims." *Nitkin v. Main Line Health*, 67 F.4th 565, 569 n.1 (3d Cir. 2023) (quoting *Atkinson v. LaFayette Coll.*, 460 F.3d 447,

454 n.6 (3d Cir. 2006)); *see also Dici v. Com. of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) ("[T]he PHRA is applied in accordance with Title VII.").

In cases lacking direct evidence of discrimination—like this one—courts apply the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). Under this framework, a plaintiff must first establish a prima facie case of discrimination. To demonstrate a prima facie case of sex discrimination, the plaintiff must show that "1) [he] is a member of a protected class, 2) [he] was qualified for the position [he] sought to attain or retain, 3) [he] suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (citing *McDonnell Douglas*). A plaintiff bears the burden of production and must establish a prima facie case of discrimination. *See Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009). If the plaintiff makes this prima facie showing, the burden of production "'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *McDonnell Douglas*, 411 U.S. at 803. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 254, 256 (1981) (emphasis in original)). The employer's responsibility to make a showing on this second prong is a "relatively light burden." *Id.* If the employer does so, the burden shifts back to the plaintiff to establish "that the employer's stated reason for the adverse action was an excuse, or pretext, for why the action was actually taken." *McDonnell Douglas*, 411 U.S. at 804. A plaintiff may generally demonstrate pretext by offering rebuttal evidence "from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted).

Foot Locker does not dispute that Eubanks has met the first three elements of the prima facie test with the adverse employment action being that of his termination. (ECF No. 42, pp. 13-14). As to the fourth element, Foot Locker contends that Eubanks did not come forth with evidence showing that his termination happened under circumstances that raise an inference of intentional discrimination. Therefore, it argues that Eubanks has not made out a prima facie case of discrimination and it is entitled to summary judgment in its favor. The Court concurs.

A plaintiff may satisfy the fourth element of a prima facie case by presenting evidence that similarly situated employees, outside of the protected class, were treated more favorably. *Mandel*, 706 F.3d at 170. A determination as to whether an employee is similarly situated generally takes into account 'the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace.'" *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (2004). Eubanks has come forth with no evidence showing that similarly situated employees were treated more favorably. Comparators must be "similarly situated" to a plaintiff, taking into consideration factors such as whether the comparator and the plaintiff had the same supervisor, were subject to the same standards, and engaged in similar conduct. *Durst v. City of Phila.*, 798 F. App'x 710, 713 (3d Cir. 2020). Davis (an assistant manager) and Cierra Gaither (a store associate who was allegedly subjected to a sexual comment from King – i.e., that Gaither would not have a cold sore if she had not been "sucking so much dick") are not comparators. Neither are transgendered. Although they may have had attendance issues, neither sent unprofessional text messages to their supervisor and coworkers. Neither were the subject of an

internal investigation, nor were they subjected to disciplinary proceedings. They both voluntarily resigned from their employment with Foot Locker. (ECF No. 52, pp. 6-7, 12-13); (ECF No. 59, pp. 12-13, 22-23). The Court holds that they are not appropriate comparators. Eubanks provides no relevant comparator evidence giving rise to an inference of discriminatory intent.

Since Eubanks does not provide "similarly-situated comparisons," he may still satisfy the fourth element by "'establish[ing] some causal nexus between [his] membership in a protected class' and the adverse employment action." *Evans v. Sch. Dist. of Philadelphia*, 2024 WL 4199010, at *2 (3d Cir. Sept. 16, 2024) (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003)). Foot Locker argues that Eubanks cannot establish that the decision makers in his termination, Szeszak and Husser, knew that he was transgendered. Thus, Foot Locker is of the position that it is "logically impossible for [ ] Eubanks' transgender status to be the motivating factor in [ ] Szeszak and [ ] Husser's decision to end [ ] Eubanks' employment." (ECF No. 42, p. 14).

This is indeed a situation where Eubanks' membership in a protected class – being a transgender male – was not patent or documented in his personnel record. There is no dispute that Eubanks never disclosed his transgender status to anyone at Foot Locker. Furthermore, and more importantly, neither Szeszak nor Husser knew Eubanks' was a transgender male until this lawsuit was filed.[9] It cannot be presumed that Foot Locker practiced unlawful discrimination

---

[9] Eubanks tries to manufacture a factual dispute by claiming the men's testimony was self-serving, but neither man is a party to this suit. Husser is no longer employed by Foot Locker. The evidence Eubanks relies on to question their testimony is nothing more than his own speculation, and it does not create a genuine issue of material fact. While Eubanks may find it hard to believe that these men did not know that he was a transgender male, no concrete evidence has been produced discounting their testimony. The record is clear that his transgender status was not apparent and he never disclosed it to Foot Locker. He failed to present evidence from

when the individuals that made the decision to terminate Eubanks' employment did not know he belonged to a protected class. *See Geraci v. Moody-Tottrup, Intern., Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("it is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant").

In an attempt to salvage his claim, Eubanks makes a convoluted argument as to a cat's paw theory of liability. The term "cat's paw" derives from a fable of a monkey that uses flattery to convince a cat to pull chestnuts out of a fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). "Today the term 'cat's-paw' refers to 'one used by another to accomplish his purposes.' ... In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decision-making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). Under the theory, an "employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Staub*, 562 U.S. at 421.

As to Eubanks' cat's paw theory of liability, an employer may "be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case." *Mason v. Se. Pa. Transp. Auth.*, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015) (citing *McKenna v. City of Phila.*, 649 F.3d 171, 178 (3d Cir. 2011)); *see also Carter v. Midway Slots & Simulcast*, 894 F. Supp. 2d 529, 543 (D. Del. 2012), *aff'd*, 511 F. App'x 125 (3d Cir.

---

which a rational jury could infer that the decision makers in his termination knew he was a transgender male.

2013). Eubanks had to establish (1) a genuine issue of material fact concerning the bias of the subordinate and (2) a genuine issue of material fact "as to whether the proffered reason for the employment action is pretextual, which in a [cat's paw] claim requires [Eubanks] to demonstrate a causal relationship between the subordinate's actions and the employment decision." *Mason*, 134 F. Supp. 3d at 874 (quoting *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th Cir. 2006)). To establish a causal relationship between the actions of a subordinate and the employment decision, a plaintiff must show proximate cause—"'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect.'" *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (quoting *Staub*, 562 U.S. at 419).

Eubanks argues that although King did not make the final recommendation to terminate his employment, she manipulated the investigation that led to it. According to Eubanks, it is dispositive that King (1) reported him for the inappropriate text messages, but she often used inappropriate and unprofessional language and curated an environment that tolerated such language, and (2) she agreed to a set schedule to accommodate his second job, but then scheduled him when she knew he was unavailable. Eubanks has conceded that he sent the text messages and that the language he used therein was inappropriate. Further, he has conceded that he was absent on seven days. Of critical importance is the fact that King did not know Eubanks was transgendered until December when his status was disclosed by a visitor to the store. Prior to that, Eubanks has adduced no evidence that anyone informed King that Eubanks was transgendered, or that she was even aware he was transgendered. There is simply no evidence to dispute that King reported Eubanks' inappropriate text message (on October 31, 2022), before she was aware that Eubanks was transgendered. No evidence has been adduced that King was

10

aware Eubanks was transgendered when he had several call-offs or no-call/no-shows for work in December 2022.  Furthermore, no evidence has been introduced that King had a conversation with Szeszak or Husser regarding Husser's investigation into Eubanks' conduct after she learned Eubanks was transgendered.

Eubanks has failed to marshal evidence to support his cat's paw theory of liability.  The record evidence does not provide a basis from which a reasonable jury could infer that King had discriminatory animus toward transgender males.  Eubanks cannot rely on his own unsupported assertions, speculation, and conclusory allegations.  There is no evidence establishing that a discriminatory animus on behalf of King proximately caused the termination of Eubanks' employment.  In fact, there is no record evidence that King wanted Eubanks fired, let alone because he was a transgender male.  Eubanks' cat's paw argument fails; it turns on nothing more than impermissible conjecture.

Because Eubanks has failed to establish a prima facie case, there is no need for the Court to consider the remaining steps of the *McDonnell Douglas* framework.  However, assuming *arguendo* that Eubanks had set forth a prima facie case of discrimination, Foot Locker came forth with legitimate, nondiscriminatory reasons for his termination – unprofessional text messages and chronic absenteeism.  Eubanks failed to come forth with evidence establishing pretext.  Eubanks has not adduced evidence that Foot Locker discriminated against other transgender individuals.  No evidence exists that the decision makers in Eubanks' termination had knowledge that he was a transgender male.  No evidence exists that Foot Locker treated similarly situated employees differently.  Eubanks adduced no evidence that any other sales associate who sent unprofessional text messages to their supervisor and had seven unexcused absences in a month was not dismissed.  Eubanks had to do more than "simply show that the

11

employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Facts, not perceptions and conjecture, are required to support Eubanks' discrimination claims. In sum, Eubanks presented no concrete evidence to discredit the legitimate nondiscriminatory reasons for his termination. There is no evidence from which a fact-finder could infer that the actions of Foot Locker were motivated by discriminatory animus. Summary judgment will be entered in favor of Foot Locker as to Count I.

### B. Summary Judgment will be entered in favor of Foot Locker as to Count III.

Eubanks was diagnosed with gender dysphoria, a psychiatric condition that involves a marked incongruence between one's experienced/expressed gender and assigned gender. AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 451-53 (5th ed., 2013) ("DSM-5"). In 2018, he began gender transitioning from female to male. Prior to his employment at Foot Locker, Eubanks underwent partial gender reassignment surgery. He had a double mastectomy in December 2020, and a hysterectomy in May 2021. He also underwent testosterone therapy. In Count III of his complaint, Eubanks brings a claim of discrimination under the ADA and the PHRA. (ECF No. 1, pp. 8-9). He contends that he suffered from gender dysphoria, and that Foot Locker discriminated against him by terminating his employment because of his disability. (*Id.*). Foot Locker argues that Eubanks' discrimination claims fail because the evidence adduced is that Eubanks himself believed he no longer suffered from gender dysphoria while employed at Foot Locker. Additionally, Foot Locker argues that there is no evidence that anyone at Foot Locker knew Eubanks had gender dysphoria as he never notified Foot Locker of his alleged disability. (ECF Nos. 42 and 57).

12

The ADA prohibits employers from discriminating against any "qualified individual on the basis of disability." 42 U.S.C. § 12112. Disability discrimination claims under the ADA and the PHRA are governed by the *McDonnell Douglas* burden-shifting framework. *See Law v. Garden State Tanning*, 159 F. Supp. 2d 787, 791 (E.D. Pa. 2001) (holding that the *McDonnell Douglas* analysis applies to employment discrimination claims under the ADA).[10] To establish a prima facie case of discrimination under the ADA, Eubanks must show that: "(1) he is a disabled person within the meaning of the [ADA]; (2) he is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Thimons v. PNC Bank N.A.*, 254 F. App'x 896, 897 (3d Cir. 2007). If the plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant to "present a legitimate, non-discriminatory reason for the negative employment decision." *Law*, 159 F. Supp. 2d at 791. To overcome summary judgment, "the plaintiff must then show that the reason presented by the defendant is pretextual." *Id.*

Foot Locker argues first that Eubanks failed to establish his prima facie case as a matter of law because he does not fall within the ADA's protected class. "A person qualifies as 'disabled' under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Keyes v. Cath. Charities of the Archdiocese of Phila.*, 415 F. App'x 405, 409 (3d Cir. 2011) (citing 42 U.S.C. § 12102(2)). The ADA defines "major life

---

[10] In general, "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) ("Pennsylvania courts ... generally interpret the PHRA in accord with its federal counterparts....")). Because these two statutes are generally coextensive, the Court will address the merits of each claim solely under the ADA. *See Taylor*, 184 F.3d at 306; *Kelly*, 94 F.3d at 105.

activities" to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.A. § 12102(2)(A). "An individual is substantially limited in performing a major life activity if that individual is unable to pursue that major life activity in a comparable manner 'to most people in the general population.'" *Arrington v. Nat'l R.R. Passenger Corp.*, 721 F. App'x 151, 154 (3d Cir. 2018) (citation omitted).

In 2009, Congress amended the ADA, instructing courts that the definition of "disability" "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A). But the ADA has its limits. It expressly excludes coverage for a disparate group of traits, habits, and mental conditions, including sexual orientation, conditions arising from drug use, and gambling addiction. 42 U.S.C. § 12211. Relevant here, the ADA also excludes mental dispositions and conditions that relate to gender expression or gender identity. It provides that "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders," are not "'disabilit[ies]'" within the meaning of its terms. 42 U.S.C. § 12211(b). The ADA does not define "gender identity disorders," and the text of Section 12211(b) does not mention "gender dysphoria."[11] In recent years, courts have grappled with whether gender dysphoria can be classified as a disability under the ADA.

-----

[11] When the ADA was enacted in 1990, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM"), did not recognize gender dysphoria as a diagnosis. It recognized "gender identity disorders," of which the essential feature is "an incongruence between assigned sex and gender identity." AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL 71 (3d ed., rev. 1987) ("DSM-III-R"). In 2013, the American Psychiatric Association removed "gender identity disorders" from the DSM-5 and added "gender dysphoria" as a diagnosis. DSM-5 at 451. The essential element of "gender dysphoria" is the "clinically

The Court will not delve into an analysis of whether gender dysphoria is included in the catchall provision, 42 U.S.C. § 12211(b), and whether Eubanks proved that his gender dysphoria resulted in a physical impairment.  Doing so is unnecessary as Eubanks testified that he no longer suffered from gender dysphoria at the time of his employment at Foot Locker.  (ECF No. 43, pp. 1-2); (ECF No.  44-2, p. 10); (ECF No. 53, p. 1); (ECF No. 58, pp. 1-2).  He specifically testified as follows:

> Q. Do you suffer from gender dysphoria?
> A. I would say in the beginning I did, but now I don't.
> Q. When would you say you suffered from gender dysphoria?
> A. Probably when I first started out, when I first started transitioning.
> Q. So around 2018?
> A. Yes.
> Q. When would you say you stopped suffering from gender dysphoria?
> A. Probably about 2021, '22.  I'm going to say when I started ending it with my therapist.  So about the end of '21, beginning of '22.
> Q. About when you started working at Foot Locker?
> A. I started working at – I said the end of '21, beginning of '22.
> Q. Okay.  Did anybody at Foot Locker know that you suffered from gender dysphoria?
> A. No.  Nobody knew nothing, like none of my personal business, until the little guy came in the store.

(ECF No.  44-2, p. 10).

Eubanks now wants a fact-finder to discount his own testimony and instead find that he had a disability by relying on notes unearthed in his medical records that state that after his gender reassignment surgery he retained a post-operative diagnosis of gender dysphoria.  (ECF No. 50, p. 18, ); (ECF No. 59, pp. 1-3).  The Third Circuit has explained that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat an entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir.

---

significant distress" felt by those who experience an incongruence between their assigned sex and their gender identity.  *Id.* at 451–53.  The DSM-5 explains that the distress caused by gender dysphoria may result in anxiety, depression, suicidal ideation, and even suicide.  *Id.* at 454–59.

1990) (citation omitted). Eubanks is attempting to manufacture a factual dispute to bolster his litigation claims. No evidence of record exists that he suffered from gender dysphoria during his employment at Foot Locker. Eubanks specifically testified that he stopped suffering from gender dysphoria in late 2021 or 2022. (ECF No. 44-2, p. 10). Also of note is the following portion of his testimony:

> Q. What – why do you believe that you were dismissed?
> A. I believe I was dismissed because we were putting allegations against her [(King)]. I actually think it was a retaliation kind of thing.
> Q. Do you think you were dismissed because you were transgendered?
> A. No. I just think I was dismissed because I was speaking up for myself, basically.
>
> \*       \*       \*
>
> Q. Do you think you were discriminated against – and however you want to understand discrimination – because of any disability you have?
> A. No.

(ECF No. 44-2, pp. 9-10). Hence, the record evidence is such that Eubanks himself did not believe he was a disabled person during his employment at Foot Locker and did not believe he was discriminated against by Foot Locker due to a disability. Eubanks' claim fails because he has not made the threshold showing that he was disabled within the meaning of the ADA.

Beyond the fact that Eubanks did not believe he suffered from a disability, Eubanks never mentioned his alleged disability, gender dysphoria, to anyone at Foot Locker. As the individuals who decided to terminate Eubanks had no knowledge of his alleged disability of gender dysphoria, Eubanks did not suffer an employment decision as the result of discrimination. Without a causal connection, a reasonable jury could not rationally conclude that Eubanks was subjected to disability discrimination in violation of the ADA and the PHRA.

Because Eubanks has failed to establish a prima facie case, there is no need for the Court to consider the remaining steps of the *McDonnell Douglas* framework. However, assuming

16

*arguendo* that Eubanks had set forth a prima facie case of disability discrimination, Foot Locker came forth with legitimate, nondiscriminatory reasons for his termination – unprofessional text messages and chronic absenteeism.  As set forth in the previous section, Eubanks failed to come forth with evidence establishing the existence of pretext.  For these reasons, summary judgment will be entered in favor of Foot Locker as to Count III.

### C.  Summary Judgment will be entered in favor of Foot Locker as to the hostile work environment claims at Counts II and V.

In Count II, Eubanks brings a hostile work environment claim under Title VII and the PHRA.  He takes issue with being called "homophobic slurs by his coworkers," and claims that no corrective action for the harassment was taken by his supervisors.  (ECF No. 1, pp. 6-7).  In Count V, Eubanks brings a hostile work environment claim under the ADA and the PHRA.  He takes issue with the "egregious and bigoted comments" his coworkers made "after an acquittance outed him as a transgender male."  (*Id.* at 12).  According to Eubanks, this harassment was "based on his disability." (*Id.*).

A hostile work environment is one so "permeated with discriminatory intimidation, ridicule, and insult" that it becomes "abusive."  *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To state a hostile work environment claim under Title VII and the PHRA based on gender discrimination,[12] a plaintiff must prove that:  (1) he suffered intentional discrimination; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected the plaintiff"; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances"; and (5) "the existence of *respondeat superior*

---

[12] Hostile work environment claims under Title VII and the PHRA are subject to the same legal standard and are properly analyzed together. *See Atkinson*, 460 F.3d at 454 n.6 (citing *Kelly*, 94 F.3d at 105).

liability." *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 310 (3d Cir. 2018) (quoting *Mandel*, 706 F.3d at 167). Similarly, to advance a hostile work environment claim based on disability discrimination under the ADA, a plaintiff must establish: "(1) [he] is a qualified individual with a disability under the ADA; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [his] disability or request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment; and (5) the [defendant] knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton v. Mental Health Ass'n of Se. Penn.*, 168 F.3d 661, 667 (3d Cir. 1999).

As a threshold matter, Eubanks' hostile work environment claim fails because he has not proven that he is a qualified individual with a disability under the ADA. Furthermore, nothing in the record supports the conclusion that the homophobic comments of his coworkers were based on his alleged disability – gender dysphoria. In fact, there is nothing in the record to support a conclusion that Eubanks' coworkers were even on notice that he had a disability. A few coworkers knew he was a transgender male after a visitor to the store disclosed that information, but being transgendered is not a disability. The ADA "does not make all harassment, or every unpleasant working environment, actionable under the law. Rather, to constitute a hostile work environment under the ADA the harassing conduct must be *because* of the plaintiff's disability." *Griffin v. Municipality of Kingston*, No. 3:08–CV–2290, 2011 WL 718697, at *5 (M.D. Pa. Feb. 22, 2011) (emphasis in original) (internal quotation marks omitted) (quoting *Walton*, 168 F.3d at 667). Without knowledge of Eubanks' alleged disability, any "harassment" he suffered lacks a causal connection to his supposed disability. A reasonable jury could not rationally conclude that he was subjected to a hostile work environment in violation of the ADA.

Setting these points aside, Eubanks' ADA, Title VII, and PHRA hostile work environment claims fail for the same reason – no evidence exists that he experienced severe or pervasive discrimination. Discrimination is severe or pervasive only if it is so "extreme" that it "amount[s] to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (collecting cases). "The mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate [ ] liability." *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)), *overruled on other grounds*. "Unless they are extremely severe, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim." *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609 (3d Cir. 2007). Several factors are to be considered in analyzing a hostile work environment claim: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. When analyzing a hostile work environment claim, courts should "concentrate not on individual incidents, but on the overall scenario." *Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005)). "The sporadic use of abusive language, gender-related jokes, and occasional teasing" do not suffice to state a claim ….." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[T]he vicissitudes of everyday life in the workplace do not rise to the level of a hostile work environment; something more is required." *Williams v. Pennsylvania Hum. Rel. Comm'n*, Civil Action No. 14-1290, 2016 WL 6834612, *24 (W.D. Pa. Nov. 21, 2016).

Sometime in December 2022, the son of Eubanks' ex-girlfriend came into the store and disclosed Eubanks' transgender status. According to Eubanks, the next day, King called him "it" and a "little faggot." Also that day, a part-time sales associate called him "dyke," and referred to Eubanks by the name he used prior to his gender transition (Ebony). Eubanks alleges that on three more shifts the same part-time sales associate called him by his prior name. What Eubanks has come forth with are sporadic offensive comments ("it," "dyke," and "little faggot") and being called by his former name on four occasions. None of the comments were physically threatening. No jury could reasonably find that these few comments amounted to the level of pervasive prejudice, disparagement, and interference necessary to establish a plausible hostile work environment.

The comment made by Solomon in a conversation about sports – i.e., that Eubanks would not understand the conversation because Eubanks was not a real man – that occurred months before the summer of 2022, was an isolated incident by an employee who had no role in Eubanks' termination, and in fact, was no longer employed at Foot Locker at the time of Eubanks' termination. Significantly, Eubanks never raised a complaint about Solomon's comment to anyone at Foot Locker.

"Isolated incidents and offhanded comments . . . are not sufficient to sustain a hostile work environment claim." *Stucke v. City of Phila.*, 685 F. App'x 150, 153 (3d Cir. 2017) (internal quotation marks and citation omitted). No evidence has been adduced that Eubanks' workplace was permeated with intimidation, ridicule, and insult. Eubanks did not face any sort of targeted, derogatory comments over a lengthy period of time such that it affected his work performance or conditions of employment. He worked at Foot Locker for a year before a store visitor disclosed that Eubanks was a transgender male. Eubanks attempts to retroactively

manufacture a hostile work environment by pointing to comments made behind his back amongst his coworkers about him, other coworkers being subjected to sexually harassing comments, and the use of foul language in the store. The Court finds that none of this, which is in no way evidentiarily linked to Eubanks or his protected status, elevated his workplace to a hostile environment. Of particular note is the fact that Eubanks, in December 2022, had seven call-offs or no-call/no-shows for work, and he only worked five shifts between December 24, 2022, and January 2023. During that time, Eubanks never raised any complaints to Szeszak, and he never called Foot Locker's Human Resources Hotline to report his coworkers' comments.

"The threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (nonprecedential). Eubanks failed to evidentiarily establish that he was subjected to severe or pervasive discrimination. He has also failed to meet his burden to explain why (with factual support) a reasonable person in like circumstances would be detrimentally affected. His cursory contention that a transgender male in like circumstances would be detrimentally affected is insufficient. Because Eubanks has not produced evidence raising a genuine dispute as to whether he experienced harassment that, viewed objectively, was so pervasive or severe as to change the conditions of his employment and create an abusive work environment, summary judgment will be granted in favor of Foot Locker as to Counts II and V.

### D. Summary Judgment will be entered in favor of Foot Locker as to the retaliation and wrongful termination claims at Count IV.

In Count IV of his complaint, Eubanks brings retaliation and wrongful termination claims in violation of the ADA and the PHRA. (ECF No. 1, pp. 10-11). Eubanks alleges that he had the disability of gender dysphoria, he engaged in the protected activity of reporting harassment on account of his "perceived disability," and his employment was then terminated. (*Id.*). Foot

Locker argues that it is entitled to summary judgment because Eubanks failed to establish a prima facie case because Eubanks never engaged in any legally-cognizable protected activity. Foot Locker further argues that it possessed legitimate, non-retaliatory reasons for terminating Eubanks' employment, and that Eubanks cannot demonstrate a causal connection or pretext. (ECF No. 42, pp. 20-23). In Eubanks' response, he contends that he is also bringing a claim for retaliation under Title VII. (ECF No. 50, pp. 18, 21). Foot Locker, in its reply, contends that Eubanks did not specifically plead in his complaint a claim for retaliation under Title VII. (ECF No. 57, pp. 10-11). Regardless, it argues that Eubanks' Title VII claim fails for the same reason his other retaliation claims fail. (*Id.* at 11-12). The Court agrees.

Contrary to Eubanks' protestations otherwise, the Court holds that he did not plead a retaliation claim under Title VII in his complaint. It is not asserted as one of the counts Eubanks brought, which were: Count I – sec discrimination in violation of Title VII and the PHRA; Count II – hostile work environment in violation of Title VII and the PHRA; Count III – discrimination in violation of the ADA and the PHRA; Count IV – retaliation and wrongful termination in violation of the ADA and the PHRA; and Count V – hostile work environment in violation of the ADA and the PHRA. (ECF No. 1). The Court does not give credence to Eubanks' argument that Foot Locker was on fair notice of his claim under Title VII by virtue of his factual averments within his complaint. (ECF No. 63, p. 2). There is no question that Eubanks raised a new claim (retaliation under Title VII) in opposition to a Rule 56 motion, which he was prohibited from doing. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 499 at n. 1 (3d Cir. 1997). A "plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgement." *Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008). While the Court is of the opinion that it is too late for Eubanks to amend his

complaint in accordance with Federal Rule of Civil Procedure 15(a), it will nevertheless analyze Eubanks' Title VII claim in the interest of judicial economy.

The *McDonnell Douglas* burden-shifting framework applies to Eubanks' Title VII, ADA and PHRA retaliation claims. *See Kelly*, 94 F.3d at 105 (analyzing claims under the ADA, Title VII, and the PHRA under the same framework). To establish a prima facie case of retaliation, a plaintiff must show that (a) he engaged in a protected activity, (b) the employer took materially adverse action against him, and (c) there was a causal connection between the protected activity and the employer's action. *Young v. City of Phila. Police Dept.*, 651 F. App'x 90, 95 (3d Cir. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340–42 (3d Cir. 2006)) (discussing Title VII retaliation claims); *Wilson v. Childs.' Hosp. of Phila.*, No. 23-3223, 2024 WL 4490601, at *2 (3d Cir. Oct. 15, 2024) (citing *Krouse*, 126 F.3d at 500) (discussing ADA retaliation claims).[13] If the plaintiff can establish a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas*, 411 U.S. at 802. If the defendant meets this minimal burden, the plaintiff must point to evidence "that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse*, 126 F.3d at 501.

As to Eubanks' ADA claim, Foot Locker argues that Eubanks did not meet the first element of a prima face retaliation case because he did not oppose any practice made unlawful by the ADA. Eubanks responds that he complained to Davis about the "homophobic slurs" of his coworkers – the he was called a "little faggot," a "dyke," "it," and referred to by his previous

---

[13] "Unlike a general ADA discrimination claim, an ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA, but only that the plaintiff had a reasonable good faith belief that he was entitled to request the reasonable accommodation he requested." *Payne v. Woods Services, Inc.*, 520 F. Supp. 3d 670, 680 (E.D. Pa. 2021) (quoting *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010)).

name. (ECF No. 50, pp. 22-27); ECF No. 52, p. 11). However, no evidence exists that Eubanks made specific complaints about comments or conduct of coworkers related to his alleged disability of gender dysphoria. The Court concurs that Eubanks' ADA claim fails at the first step of the prima facie case.

All of Eubanks' claims fail at the third step of the prima facie case; he has not come forth with evidence of a causal connection between his termination and report of harassment to Davis. A causation analysis often, but not exclusively, rests on two key factors: "(1) the temporal proximity between the protected activity and the alleged retaliation and (2) the existence of any pattern of antagonism in the intervening period." *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (internal quotations omitted). "The Court measures temporal proximity from the date on which the litigant engaged in his first protect[ed] action." *Gairloch v. Pa. State Univ.*, 84 F. Supp. 3d 407, 418 (M.D. Pa. 2015) (citing *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014). "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity ... is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Jensen*, 435 F.3d at 450 (quoting *Krouse*, 126 F.3d at 503-04). In the absence of unusually suggestive temporal proximity or a pattern of antagonism, courts "consider all of the proffered evidence as a whole to determine whether it may suffice to raise the inference" of causation. *Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 367 (W.D. Pa. 2012) (quotation omitted); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference."). Regardless of the evidence a plaintiff relies on to

establish causation, however, a plaintiff must also satisfy an initial gateway requirement by establishing that the defendant knew of the plaintiff's protected activity. *See Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

On October 31, 2022, Foot Locker launched an investigation into Eubanks for sending unprofessional text messages. He began to have attendance issues (call-offs or no-call/no-shows for work), which were incorporated into the investigation. Eubanks testified during deposition that a visitor to the store publicly disclosed that he was a transgender male on December 23, 2022. In response Foot Locker's summary judgment motion, Eubanks claims he was mistaken about the date of the incident. Regardless of when this incident occurred, Eubanks complained about his coworkers' comments thereafter to Davis. Davis resigned from Foot Locker on December 21, 2022, and never returned to the store after his resignation. Davis never brought Eubanks' complaint to King, Szeszak, or Husser, and he never called Foot Locker's Human Resources Hotline. Eubanks only worked five shifts between December 24, 2022, and January 3, 2023, when he was terminated. Notably, Eubanks never raised any complaints to Szeszak and he never called Foot Locker's Human Resources Hotline to report alleged harassment. Given the fact that Eubanks' performance was already under review when he complained to Davis, and his termination came weeks after his complaint to Davis, the temporal gap between Eubanks' report of harassment to Davis is not suggestive of causation.

Eubanks has come forth with no evidence of a pattern of antagonism between when he made his complaint to Davis and his termination. No evidence exists that his coworkers knew Eubanks had complained to Davis. Significantly, the decision makers in Eubanks' termination

had no knowledge of his complaint to Davis.  For these reasons, a causal connection is lacking.  Eubanks has not met his burden of proof as to his prima facie case.

Because Eubanks has failed to establish a prima facie case of retaliation under the ADA, Title VII, and the PHRA, there is no need for the Court to consider the remaining steps of the *McDonnell Douglas* framework.  However, assuming *arguendo* that Eubanks had set forth a prima facie case of retaliation, Foot Locker came forth with legitimate, nondiscriminatory reasons for his termination – unprofessional text messages and chronic absenteeism.  As set forth in the previous sections, Eubanks has failed to come forth with evidence establishing the existence of pretext.  Summary judgment will be granted in favor of Foot Locker as to Count IV.

## IV.    CONCLUSION

For these reasons, Foot Locker's motion will be granted in its entirety.  The Court will not "sit as a kind of super-personnel department that reexamines [Foot Locker's] business decisions." *Andersen v. Mack Trucks, Inc.,* 118 F. Supp. 3d 723, 750 (E.D. Pa. 2015) (citations omitted).  Summary judgment will be entered in favor of Foot Locker.  Orders of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

_____4/21/25_____
Date

26